IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARSOFT, INC.,                    §
                                  §
      Plaintiff,                  §
                                  §
v.                                §        CIVIL ACTION NO. H-13-2332
                                  §
UNITED LNG, L.P., UNITED LNG      §
HOLDINGS, LLC, and STEPHEN        §
P. PAYNE,                         §
                                  §
      Defendants.                 §

**MEMORANDUM, RECOMMENDATION AND ORDER ON INJUNCTIVE RELIEF**

Pending before the court[1] is Plaintiff's Motion for Preliminary Injunction (Doc. 3) and Defendants' Objections to Plaintiff's Proposed Findings of Fact (Doc. 95). The court has considered the motion, the objections, the responses, the evidence adduced at the preliminary injunction hearing, the post-hearing briefs, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Plaintiff's motion for preliminary injunctive relief be **GRANTED IN PART**, **DENIED IN PART**. Defendants' objections to Plaintiff's proposed findings of fact are **GRANTED IN PART, DENIED IN PART.**

## I.  Case Background and Preliminary Rulings

On August 9, 2013, Plaintiff Marsoft, Inc., ("Marsoft") filed this lawsuit, alleging breach of contract against Defendant United

---

[1]      This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 28.

LNG, L.P., ("United"), tortious interference with a contract against Defendants United LNG Holdings, LLC, ("United Holdings") and Stephen P. Payne ("Payne"), and tortious interference with a business relationship, anticipatory breach, business disparagement, and fraudulent inducement against United, United Holdings and Payne.[2]

Also on August 9, 2013, Marsoft sought a preliminary injunction against United, United Holdings and Payne enjoining them from: (1) making false or disparaging statements regarding Marsoft; (2) replacing Marsoft on the floating liquified natural gas project ("FLNG Project"); (3) taking any action to diminish Marsoft's equity stake in the maritime components of the FLNG Project; and (4) reassigning or reselling Marsoft's exclusive brokerage roles under the Letter of Agreement ("LOA") between Marsoft and United.[3]

On December 20, 2013, the court heard testimony from the parties relative to Marsoft's request for injunctive relief.  Each party called one witness:  Marsoft called its chairman, Paul Eckbo ("Eckbo"), and United called Constantine Giekes ("Giekes"), a Braemar Engineering ("Braemar") engineer.

After United rested its case, Marsoft complained that Erik Saenz ("Saenz"), United's chief financial officer, had not been called to testify despite being identified as a witness by United.

---

[2]     See Doc. 1, Verified Compl. pp. 10-13.

[3]     See Doc. 3, Pl.'s Mot. for Prelim. Inj. p. 1.

The court offered Marsoft the opportunity to question Saenz, but Marsoft declined.[4]

Because of document-production issues, the court allowed the deposition of Saenz to be reconvened in order that Marsoft have the opportunity to question Saenz about United's supplemental document production.[5]   The court also granted leave for Marsoft to supplement its evidence from the second Saenz deposition relative to this document production, if necessary.[6]

In Marsoft's submitted findings of fact, Marsoft proposes findings of fact supported by testimony from Saenz's first deposition, along with other documents that were attached as exhibits to the first and second Saenz depositions.[7]   United has objected to this evidence as being outside the hearing record.   In response, Marsoft argues that the deposition testimony is admissible as an admission of a party opponent.

Here, Marsoft had the opportunity to question Saenz at the preliminary injunction hearing.   The court allowed Marsoft to supplement the record only with regard to the recently-produced bank records and the post-hearing deposition of Saenz.   Any other testimony of Saenz, even if admissible pursuant to Fed. R. Evid.

---

[4]     Doc. 88, Tr. of Prelim. Inj. Hr'g ("Tr.") 202-05, 207-10.

[5]     Tr. 202-03.

[6]     Tr. 210-11.

[7]     See Doc. 93, Aff. of Michael Licker pp. 1-3 (authenticating certain documents).

801(d)(2)(A), is simply untimely.  Thus, in considering the present motion, the court will consider testimony and exhibits that were admitted at the December 20, 2013 injunction hearing as well as testimony and documents from Saenz's January 7, 2014 deposition.[8] Defendants' objections to other post-hearing evidence is **SUSTAINED**.

Defendants also allege that Marsoft's proposed findings of fact impermissibly attempt to expand the scope of the injunctive relief sought by including findings based on the transfers of United's assets to Payne and insider Chalid Arrab ("Arrab") and disseminating Marsoft's confidential work product to third parties. Marsoft argues that United had ample notice of these additional claims because Saenz was questioned about those topics at his first deposition.

The court agrees with United that these contentions are outside the scope of Marsoft's request for preliminary injunctive relief and that United was entitled to rely on the pleadings for notice of Marsoft's claims.[9]  Thus, the court will consider only those grounds urged in Marsoft's Motion for Preliminary Injunction.[10]  United's objection is **SUSTAINED**.

## II.  Proposed Findings of Fact

---

[8]      Exhibits G and J are from Saenz's post-hearing deposition. <u>See</u> Doc. 93, Aff. of Michael Licker pp. 2-3.

[9]      <u>See</u> Doc. 3, Pl.'s Mot. for Prelim. Inj. p. 1.

[10]      <u>Id.</u>

4

1.   Marsoft is a Delaware corporation with a principal place of business in Boston, Massachusetts.[11]  It was founded in 1979 by Eckbo.[12]   According to Eckbo, Marsoft offers decision-making consulting services in the maritime industry.[13]  Eckbo testified that he developed a set of business models for maritime trading and transportation while he was at the Massachusetts Institute of Technology.[14]  These models formed the basis of Marsoft's consulting services.[15]  Marsoft is not an engineering firm.[16]  Its world-wide revenues are less than five million dollars per year.[17]

2.   In May 2012, United, through Payne and Arrab, approached Freeport-McMorRan Energy ("FME"), the owner of an off-shore import Liquefied Natural Gas ("LNG") facility known as the Main Pass Energy Hub ("MPEH"), and Marsoft with a business opportunity.[18] Payne and Arrab represented that they had secure bankable off-taker contracts for thirty-four million tons per annum of LNG and wanted to export that amount of LNG through the MPEH by means of a

---

[11]   See Doc. 1, Verified Compl. p. 1.

[12]   Tr. 77.

[13]   Id.

[14]   Tr. 78.

[15]   Id.

[16]   Id.

[17]   Tr. 165.

[18]   Tr. 79-80.

floating liquefaction and storage offshore facility ("FLSO").[19]

3.  Eckbo explained that the MPEH was to be a hub for a group of liquefaction vessels that would take gas from the MPEH, process it into LNG, and load it onto vessels that would transport the LNG to overseas buyers.[20]  United was interested in Marsoft's ability to assess maritime transportation logistics, vessel technology and vessel construction related to the FLSO.[21]  United's off-taker agreements were with PTT, a Thai company.[22]  As a non-free-trade ("non-FTA") country, a company in the United States would be unable to ship energy products to Thailand without a non-FTA license issued by the U.S. Department of Energy.[23]

4.  Eckbo stated that United represented to him both verbally and in emails that it had forty-five million dollars in working capital for the floating LNG project ("FLNG Project").[24]

5.  Eckbo prepared the first draft of a letter agreement in June 2012, and the parties exchanged several drafts after that.[25]  Marsoft and United executed a Letter of Agreement ("LOA") on July

---

[19]   Id.

[20]   Tr. 79.

[21]   Tr. 106.

[22]   Tr. 172-73.

[23]   Tr. 173.

[24]   Tr. 83.

[25]   Tr. 80.

12, 2012.[26]  Eckbo signed for Marsoft and Payne signed for United.[27]

6.    The LOA's first section, entitled "Background," represented that United had secured natural gas reserves in North America and had committed them in LNG form to clients in Asia.[28] The LOA stated that United's intent was to leverage the latest liquefaction and transportation technology to ensure the most efficient business model to provide LNG to Asia.[29]

7.    The Background section of the LOA acknowledged that Marsoft was "engaged in the provision of services to the shipping and financial community including development and/or acquisition of technology solutions, shipping capacity through chartering and ownership programs to meet the specific financial objectives of cargo and ship owners."[30]  The Background section also stated that Marsoft was committed to supporting United in developing a business model for United's FLNG Project.[31]

8.    The next section of the LOA was entitled "Objective."[32] That section listed certain "wishes" of the parties.[33]  For example,

---

[26]    Tr. 85.

[27]    Id.; see also, Pl.'s Ex. 3, LOA.

[28]    Pl.'s Ex. 3, LOA, p. 1.

[29]    Id.

[30]    Id.

[31]    Id.

[32]    Id.

[33]    Id.

"[United] wishes to engage [Marsoft] to advise [United] on all shipping and FLSO issues . . . and recommend the most efficient and cost effective business model to fulfill the PTT contract."  That bullet point concluded, "[United] also wishes [Marsoft] to secure a group to own and operate vessels."[34]  The next bullet point stated, "[Marsoft] wishes to advise [United] in exchange for a consulting fee and a brokerage fee . . . and an equity position in each floater/ship project . . . Furthermore, [Marsoft] will organize a group to provide, fund, own and operate FLSOs and LNG carriers."[35]

9.   After the LOA set forth the objectives of the parties outlined in part above, it identified with more specificity the concept work to be performed to commence the FLNG Project.  This section, entitled "Scope of Work," identified six broad categories of analyses to be performed and decisions to be made in furtherance of the FLNG Project.[36]

10.   The LOA's Scope of Work provision required Marsoft to identify and assess different technologies and equipment options, the costs, timing and risks involved in each technology.[37]  Marsoft

---

[34]    Id.

[35]    Id. pp. 1-2.

[36]    Those categories are:  "A.  Identify the floating Liquefaction and Storage technology, cost and availability;" "B. Identify and gather Information on secondary LNG terminals to facilitate swapping/trading of LNG;" "C. Port Analysis;" "D. Identify the type of LNG carrier(s);" "E. Vessel Availability & Economics;" and "F. Shipyard Availability."  See id. pp. 2-3.

[37]    Id. pp. 3,4; Tr. 89-90.

was also to provide advice about how best to secure and fund the vessels necessary for the FLNG project's success.[38]

11.  Notably, organizing a group of investors or operators of vessels for the project was not identified as part of the "Scope of Work" to be performed by Marsoft under the LOA.  The LOA did not provide a time frame or deadline within which the Scope of Work was to be performed.

12.  The LOA also outlined "Key Deliverables" for moving the project forward.[39]  Those deliverables were: (1) to reach an agreement on FLSO specifications, technology, cost and scaling; (2) to reach an agreement on fleet size, vessel size and technology specifications; (3) to provide a ship selection/optimization model to simulate various market conditions; (4) to provide a financial model to carry out financial analysis of the project; (5) to provide recommendations on the most effective and cost-efficient FLSO and LNG shipment model; (6) to analyze whether ownership of vessels is necessary to maximize returns; (7) to provide a well-defined framework and implementation plan to support the recommended business model; (8) to provide details of organizational capacity required for the recommended option; and (9) to provide options for owned vessels after expiration of the

---

[38]  Tr. 89-90.

[39]  Id. pp. 3-4.

9

PTT contract.[40]

13.  Eckbo also discussed the LOA's requirement of "Key Deliverables."[41]  In his words, Marsoft undertook to evaluate and assist in the decision-making on the FLSO's specifications, technology, costs, scale of the project, markets and long-term trends.[42]  This involved determining the optimum size of the vessel, the fleet size, and ship selection within a business model.[43]

14.  Eckbo agreed that Marsoft was responsible for developing the drawings required for an "RFP" for permitting, pre-FEED[44] and EPC[45] drawings.[46]  Eckbo testified that, as these were not "deliverables" under the LOA, Marsoft had not forwarded these drawings to United.[47]

15.  Marsoft's organizing a group of investors or operators of vessels for the project was not identified as a "Key Deliverable" by the LOA.  The LOA did not provide a time frame or deadline within which the "Key Deliverables" were to be performed.

---

[40]   Id.

[41]   Tr. 89.

[42]   Id.

[43]   Tr. 89-90.

[44]   "FEED" is an acronym for "front-end engineering design."  Tr. 46.

[45]   "EPC" is an acronym for "engineering procurement and construction."  Tr. 49.

[46]   Tr. 184.

[47]   Tr. 185.

16.    The LOA stated, "The parties will work together on a mutually exclusive basis[,]" and "The relationship between [United] and [Marsoft] is to be evergreen unless material breach is committed by either party."[48]

17.    Under the LOA, United agreed to compensate Marsoft in three ways: (1) Marsoft was to receive a consulting fee of $400,000 per quarter; (2) Marsoft was to be paid a brokerage fee for any agreements it secured with shipbuilders to construct vessels for the project; and (3) Marsoft and United would be equal partners in a to-be-formed company, UL Marine.[49]

18.    In December 2012, Marsoft completed its "Coastal Liquefaction Corp Ltd - Introductory presentation [sic]" summary, a "deliverable" under the LOA.[50]  This document analyzed likely future rates, values and markets for LNG.[51]  Marsoft also authored a presentation on mooring systems to fulfill one of its obligations under the LOA.[52]

19.    Marsoft consulted with GL Noble Denton regarding the feasibility of the FLNG Project concept.[53]  After the consult with

---

[48]    Id. pp. 2, 5; Tr. 86-87.

[49]    Tr. 107-08; Pl.'s Ex. 3, LOA pp. 4, 5.

[50]    Tr. 91-92; Pl.'s Ex. 4, Coastal Liquefaction Corp. Ltd. Presentation.

[51]    Tr. 92.

[52]    Tr. 93; Pl.'s Ex. 5, Mooring Systems.

[53]    Tr. 97-99.

GL Noble Denton, Marsoft completed a several-hundred-page report covering many topics, including shipyard capabilities, feasibility of available technologies, pre-FEED selection decisions, preprocessing decisions, processing task decisions, and functional issue decisions.[54]

20. During the concept development, it was decided to change from a FLSO concept to a coastal liquefaction storage and off-loading facility ("CLSO") concept.[55]

21. Under the business model proposed by Marsoft and acknowledged by the LOA, a company to be known as UL Marine was to be formed whereby Marsoft and United could share in the success of the project and "realize an equity value."[56]  The LOA provided that UL Marine was to be owned 50-50 between Marsoft and United.[57]  UL Marine was to own ten percent of United.[58]

22. On November 13, 2012, Eckbo and Payne met in Houston to agree on basic rules for a shareholder agreement and the formation of UL Marine.[59]  Eckbo agreed that he did not have a prepared agenda for this meeting but averred that the formation of UL Marine was a

---

[54]    Pl.'s Ex. 6, Support to Marsoft For the Development of a FLNG Vessel [Binder].

[55]    Tr. 166-67, Def's Ex. 1, CSLO Cash Flow Model.

[56]    Tr. 110-11.

[57]    Tr. 110; Pl.'s Ex. 3, LOA p. 5.

[58]    Pl.'s Ex. 3, LOA p. 5.

[59]    Tr. 113.

critical component to obtain investors for the FLNG Project.[60]

23.  Eckbo agreed that the LOA listed as "objectives" that Marsoft "secure a group to own and operate vessels" and "organize a group to provide, fund, own and operate FLSOs and LNG carriers."[61] In pursuit of these objectives, Marsoft attempted to raise money for the FLNG Project and, to that end, developed a separate business plan for the liquefaction vessels.[62]  Eckbo testified that he made many presentations of this plan to shipowners seeking their participation.[63]

24.  Formation of UL Marine was becoming increasingly important because Eckbo was attempting to persuade one shipbuilder, Stena, to invest in the FLNG Project.[64] Eckbo explained that it was generally contemplated that Stena would loan a yet-unformed special purpose entity, to be known as Coastal Liquefaction Corporation ("CLC"), 200 million dollars through a convertible loan that would give Stena equity in CLC.[65]

25.  In support of his testimony, Eckbo identified an email sent to United on December 5, 2012, outlining what United needed to

---

[60]    Tr. 154.

[61]    Tr. 177-78; Pl.'s Ex. 3, LOA pp. 1-2.

[62]    Tr. 100.

[63]    Tr. 100-01.

[64]    Tr. 155-57.

[65]    Id.

do to obtain Stena's commitment to invest ten million dollars by December 15, 2012.[66]  The email stated that Stena needed proof of commitment letters between United and McMorRan regarding the lease or purchase of the MPEH, proof that United had secured enforceable commitments to supply it with gas, a viable business plan, a detailed funding plan, documentation of regulatory approval, and confirmation of a resource base.[67]

26.  At best, United could only produce conditional letters of intent.[68]  Because United could not verify that it had bankable contracts with gas providers and had no business plan or financial documents, Stena ultimately declined to participate.[69]

27.  Eckbo testified that, in January 2013, he and Payne decided to incorporate UL Marine in Bermuda upon the advice of counsel.[70]  As agreed, Marsoft incorporated United Marine Holdings, Ltd., ("UMHL") in Bermuda.[71]  Two other entities, CLC and Trading and Transportation Corporation, were set up as a wholly-owned subsidiaries of UMHL.[72]

---

[66]   Pl.'s Ex. 7, Email Re: Priority List Dated Dec. 5, 2012.

[67]   Tr. 103; Pl.'s Ex. 7, Email Re: Priority List Dated Dec. 5, 2012 pp. 1-2.

[68]   Tr. 102.

[69]   Id.

[70]   Tr. 113.

[71]   Tr. 114.

[72]   Tr. 157-59.

28. Eckbo admitted that there was no specific written agreement obligating Marsoft to set up either CLC or Trading and Transportation Corporation, but he considered it part of Marsoft's charge under the LOA to manage "everything that floats."[73]

29. While Marsoft was attempting to secure funding for the FLNG Project in late 2012, United was separately pursuing the same goal. On November 9, 2012, United signed a "proposed term sheet" with Pine Capital Management ("PCM") whereby in exchange for a ten-million-dollar loan, United assured exclusivity to PCM to charter the first twenty-three LNG transport ships to United's Marine Transport Division for delivery of LNG to customers.[74] The PCM loan term sheet stated that if the loan was not repaid at the end of the loan's term, one year, United would assign PCM twenty-five percent equity in United.[75] The loan carried a fifty-percent interest rate.[76] This two-page document showed a closing date of December 15, 2012.[77]

30. In an email dated December 5, 2012, Eckbo cautioned Payne and Arrab from entering into a binding agreement with PCM on such terms, arguing that the fifty-percent interest rate would be a

---

[73]   Tr. 159-60.

[74]   Pl.'s Ex. 8, Proposed Term Sheet for PCM Loan p. 1.

[75]   Id.

[76]   Id.

[77]   Id.

"credibility killer" to any hopes of closing on a ten-million-dollar investment from Stena.[78]   Eckbo also objected to United's conveyance of any rights to marine charters to PCM, reminding Payne and Arrab that charter rights belonged to UL Marine (later, UMHL) under the LOA.[79]

31.  At the hearing, Eckbo testified that he did not believe that any loan agreement was finalized between United and PCM.[80]

32.  On February 5, 2013, Westgate Tankships Inc. ("Westgate") sent a proposal to United where, in nonbinding provisions, DCC Bulk, Ltd., an affiliate of Westgate, would purchase a five-percent limited partnership interest in United from Payne in exchange for Westgate's management/acquisition of up to twenty-three of the first twenty-three vessels to be used in the FLNG Project.[81] Westgate's initial investment was projected to be two million dollars for the rights to operate six vessels.[82]   Westgate also promised to use its best efforts to locate other investors to invest up to thirteen million dollars.[83]

33.  The actual "binding" terms of the Westgate agreement were

---

[78]   Pl.'s Ex. 9, Email Re: PCM Loan Dated December 5, 2012.

[79]   Id.

[80]   Tr. 120.

[81]   Pl.'s Ex. 10, Letter Dated Feb. 5, 2013.

[82]   Id. p. 2.

[83]   Id.

much more limited.  There, the parties agreed that the non-binding terms were not enforceable and that they would negotiate to arrive at "mutually acceptable Agreements for approval, execution and delivery on the earliest practicable date."[84]  The parties also agreed that neither party would make any disclosures about the transaction and that United would provide to Westgate monthly reports on its progress with the FLNG Project.[85]

34.    By March 2013, when Eckbo asked for United's share of UMHL's incorporation costs, Payne told Eckbo that United was no longer interested in participating in UMHL.[86]  As a result, Marsoft presently owns one-hundred percent of UMHL's stock.[87]    Eckbo testified that Marsoft will transfer fifty percent of the stock of UMHL to United as agreed in the LOA if Payne changes his mind.[88] The company has no assets; however under the LOA, UMHL should own ten percent of United.[89]

35.    Eckbo denied being told by United or Payne that Marsoft's rights to equity in UMHL were contingent on Marsoft's securing funding for the FLNG Project.[90]

---

[84]    Id.

[85]    Id.

[86]    Tr. 114.

[87]    Tr. 115, 155.

[88]    Tr. 200.

[89]    Tr. 115.

[90]    Tr. 116.

36.   Eckbo testified that he attended the "LNG 17," a large industry conference held in Houston during the week of April 17, 2013.[91]   At the conference, Marsoft and United invited a number of potential purchasers of LNG, contractors and subcontractors to review the FLNG Project.[92]   At a cocktail party, Payne presented Marsoft's concepts and projections for the project and stated that Marsoft would be "responsible for everything that floats."[93]   A number of Marsoft's slides were shown to the attendees.[94]

37.   Several weeks later, on May 8, 2013, Eckbo met Payne, Arrab and Roderick Thompson ("Thompson") in Dubai to discuss organizational changes ("May 8 Meeting").[95]   A document from this meeting entitled "Team and Committee Organization Outline" showed that Marsoft representatives were to be included in most of the management committees.[96]

38.   However, at the May 8 Meeting, Payne and Arrab told Eckbo that the FLNG Project had become more valuable than originally anticipated at the time United signed the LOA.[97]   Payne and Arrab demanded that Marsoft to transfer seventy-five percent of Marsoft's

---

[91]   Tr. 123.

[92]   Tr. 124.

[93]   Tr. 125.

[94]   Tr. 124.

[95]   Tr. 129.

[96]   Tr. 131; Pl.'s Ex. 11, Team & Comm. Org. Outline.

[97]   Tr. 132.

18

interest in UMHL to Arrab, Payne and Thompson, and that if Marsoft refused, the LOA would be "worthless."[98]

39.  Eckbo refused to transfer the requested ownership because he believed Payne's, Arrab's and Thompson's self-dealing actions were disloyal to United and amounted to "corruption."[99]  After that meeting, Payne and Arrab continued to press Eckbo to reduce Marsoft's share in the FLNG Project.[100]

40.  After the May 8 Meeting, Payne and Arrab began to complain about Marsoft's work product.[101]  On June 18, 2013, Marsoft received a letter from a lawyer in Tel Aviv stating that United was terminating the LOA based on Marsoft's nonperformance.[102]

41.  Eckbo also learned from Stena that it had received a call from United informing Stena that United had terminated Marsoft for nonperformance and that Marsoft was no longer associated with the project.[103]

42.  Eckbo testified that at a meeting between Marsoft and Technip, the Technip representatives asked about Marsoft's relationship with United because United had informed Technip that

---

[98]   Id.

[99]   Tr. 133.

[100]  Tr. 134.

[101]  Tr. 135.

[102]  Id.

[103]  Tr. 136.

19

Marsoft had not performed under their agreement.[104]

43.  Eckbo testified that he heard from Marsoft employee Ingar Bergh ("Bergh") that Bergh had been told by employees of Rolls Royce, Dresser Rand, Sansung, Daewoo and Hyundai that they heard that United had terminated Marsoft's participation in the FLNG Project for nonperformance under the LOA.[105]  Marsoft subcontractor Martin Korsvold told Eckbo he had heard the same information from those companies.[106]  As this is third-hand information without specifics about when the comments were heard, who made them, or if the information regarding Marsoft's nonperformance even came from United, the court does not deem this reliable evidence at this stage of the proceeding.

44.  Eckbo complained that United forwarded Marsoft's confidential work product to others in emails.[107]  Those who received Marsoft's work product included Geiskes at Braemar, Linley Davidson, a friend of Arrab, and Konstantino Mitropolos, a shipbroker.[108]

45.  Eckbo agreed that Marsoft never secured a group to own and operate vessels that would serve the LNG project, but stated

---

[104]   Tr. 138.

[105]   Tr. 138-42.

[106]   Id.

[107]   Tr. 144; Pl.'s Ex. 1, Emails Dated June 14, 2013 pp. ULNG 000671-74.

[108]   Id.

that that was an *objective* of the LOA, not a *"key deliverable"* under the LOA.[109] Eckbo blamed Marsoft's inability to obtain investors on United's lack of firm contractual commitments to a LNG supply, a binding terminal purchase/lease contract and funding.[110]

46.   Eckbo testified that United harmed Marsoft by:  (1) not paying Marsoft fees owed under the LOA; (2) not reimbursing Marsoft for expenses incurred in the process of fulfilling Marsoft's obligations under the LOA; (3) transferring brokerage rights to Braemar; (4) proposing to use Braemar and Westgate as middlemen in potential shipyard contacts; (5) selling the rights of UL Marine to DCC Bulk and Westgate; and (6) channeling United's equity funding to Payne and Arrab for their personal enrichment.[111]   Eckbo also complained that United has damaged Marsoft's reputation and forced it to litigate to get paid.[112]

47.   Eckbo testified that he believed that Payne and Arrab would continue to sell UMHL's rights to others and to "milk" United for their own purposes.[113]

48.   Eckbo testified that Payne represented himself to be the person in charge of both United and its general partner, United

---

[109]   Tr. 176; Pl.'s Ex. 3, LOA pp. 1-2.

[110]   Tr. 178, 199.

[111]   Tr. 148.

[112]   Tr. 148-49.

[113]   Tr. 149.

Holdings.[114]

49.   Eckbo testified that Marsoft performed under the LOA for six quarters and was owed $400,000 per quarter.[115]  Marsoft has not been paid, despite promises by Payne and Arrab to pay the amounts owing.[116]  Eckbo conceded that Marsoft's consulting fees were to accrue quarterly until either United acquired four to five million dollars in equity or PTT paid a forty-million-dollar development fee to United or until December 31, 2012.[117]  Eckbo stated that Marsoft never secured a contract to build vessels for the FLNG Project because they had not completed the specifications for such a vessel.[118]

50.   Geiskes testified that he earned chemical engineering and materials science degrees from the University of California, Berkeley and considers himself a process engineer.[119]  Within the LNG supply chain, Braemar offers conceptual and process engineering services, construction oversight and due diligence checks.[120]

51.   Geiskes stated that Braemar was hired by United in July

---

[114]   Tr. 161-62.

[115]   Tr. 107-08.

[116]   Tr. 108.

[117]   Tr. 180.

[118]   Tr. 181.

[119]   Tr. 36-37.

[120]   Id.

2013 to provide technical advice on the FLNG Project.[121]  Prior to its hire, in mid-June 2013, Geiskes participated in a conference with Marsoft.[122]  The purpose of the conference was to introduce Braemar to Marsoft as United's project engineer and for Marsoft to bring Braemar up to speed on the current status of its work.[123]

52.  At the conference, Marsoft told Braemar that it was several weeks away from producing preliminary concept drawings and other preliminary engineering diagrams.[124]  Geiskes acknowledged that Marsoft was not an engineering firm and that he did not know for what purpose Marsoft had been hired by United.[125]  Marsoft never delivered any diagrams to Braemar.[126]

53. Geiskes explained that the FLNG Project, as envisioned by United, had not been accomplished by any company to date.[127] Geiskes was aware that there were two or three such floating plants under construction.[128]  One, a vessel owned by Shell, completed the

---

[121]  Tr. 39–40.

[122]  Tr. 40.

[123]  Id.

[124]  Tr. 42.  According to Geiskes, at the concept stage of a project, the client, with the assistance of its engineering consultant, would select the process and would prepare very basic layout drawings and process flow diagrams to show how the process would work.

[125]  Tr. 57.

[126]  Id.

[127]  Tr. 41.

[128]  Id.

hull construction several weeks before the hearing and the entire project was to be completed within forty-two to forty-eight months.[129]   Geiskes estimated that the project began in 2007.[130] Geiskes testified that reports within the industry indicated that the Shell project would cost between 10 and 12.5 billion dollars.[131]

54.  Geiskes agreed that Marsoft proposed constructing three vessels having significantly larger production capacity than the 3.6-million-tons-per-annum vessel being constructed by Shell.[132] Geiskes also agreed that the Shell project was designed to process "stranded gas" 200 miles offshore and required an on-board preprocessing facility while the FLNG Project would rely on pipeline quality gas coming directly into the MPEH with the preprocessing occurring at the terminal.[133]

55.  Geiskes admitted that he had never seen the contract between United and Marsoft and refused to speculate whether an eight-million-tons-per-annum liquefaction vessel was feasible.[134]

56.  Geiskes stated that relations between Marsoft and United appeared to be amicable in mid-June 2013 and he later learned from

---

[129]    Tr. 41, 52.

[130]    Tr. 53.

[131]    Tr. 42.

[132]    Tr. 41.

[133]    Tr. 59.

[134]    Tr. 58.

Saenz that Marsoft would no longer be working on the project.[135]
Saenz, Chris Caudill ("Caudill") or Payne told Geiskes that Marsoft
had been removed from the project because of a lack of "hard
deliverables."[136]  Geiskes estimated he heard this information at
some point between mid-June and mid-August 2013.[137]

57.  Geiskes admitted receiving an email from Bergh dated
August 15, 2013, wherein Bergh stated:

> [] We believe we have now developed solutions
> for each of the major technology, cost and
> regulatory risk factors for the project.  We
> are currently undertaking a "pre-FEED" level
> verification exercise with each of the
> potential component providers for the project.
> . . . An application for a patent for the
> fixed and floating structure concept and the
> allocation of tasks between the structures as
> well as the air cooling solution has been
> filed.[138]

58.  Geiskes never saw the diagrams or specifications referred
to in that email.[139]  Geiskes admitted that United had given Braemar
Marsoft's PowerPoint presentation.[140]

The post-hearing supplementation from Marsoft follows:

59.  United's bank account ending in *270 from January 2013

---

[135]   Tr. 60.

[136]   Tr. 61, 65-67.

[137]   Tr. 73, 75.

[138]   Pl.'s Ex. 2, Email Dated Aug. 15, 2013 p. ULNG 001485.

[139]   Tr. 69-70.

[140]   Tr. 61-63; Pl.'s Ex. 1, PowerPoint Presentation.

showed an initial balance of $142, a deposit in the amount of
$2,000,030, two electronic withdrawals totaling $1,450,000 and five
checks totaling $370,000.[141]  The ending balance as of January 31,
2013, was $170,102.[142] The bank record shows the source of the two-
million-dollar deposit as Panther Holding Group.[143]  In his
supplemental deposition, Saenz described the two-million-dollar
deposit as a loan and disclosed that, of those loan proceeds, $1.2
million went to pay John Speer and $200,000 went to Arrab and
Worldwide Strategies.[144]  Saenz stated that Payne owned Worldwide
Strategies and the transfer was in partial reimbursement for
Payne's lobbying fees on behalf of United.[145]

60.  United's bank account ending in *270 from February 2013
showed an opening balance of $170,102, one deposit in the amount of
two million dollars from DCC Bulk, Ltd., fourteen electronic
withdrawals totaling $1,148,287.82, five checks totaling $215,000,
twenty-two ATM/debit withdrawals totaling $28,009.45, and fees and
other withdrawals totaling $550,365.[146] Of the disbursements, two
went to Payne's company, Worldwide Strategic Energy, one for

---

[141]   Doc. 93, Ex. G to Aff. of Michael Licker, Bank Records p. 1.

[142]   Id.

[143]   Id.

[144]   Doc. 93, Ex. B to Aff. of Michael Licker, Dep. of Saenz Dated Jan.
7, 2014 pp. 321, 324.

[145]   Id. p. 325.

[146]   Doc. 93, Ex. G to Aff. of Michael Licker, Bank Records p. 2.

$100,000 and the other for $99,999.99.[147]   United's balance as of
February 28, 2013, was $228,439.73.[148]

61.   United's bank account ending in *270 for May 2013 showed
an opening balance of $71,859.60, four transfers from United's
account ending in *817 totaling $95,500, an electronic transfer of
$187,577 from DCC Bulk, Ltd., twelve electronic withdrawals
totaling $121,843.56, three checks totaling $188,493.14 and twenty-
seven ATM/debit withdrawals totaling $23,591.08.[149]   The ending
balance on May 31, 2013, was $21,056.18.[150]

62.   United's bank account ending in *817 from June 2013
showed an initial balance of $12,961.39, two deposits totaling
$1,862,423 and eighteen expenditures totaling $1,172,579.16.[151]   The
ending balance on June 30, 2013, was $702,735.23.[152]

63.   According to Saenz, United transferred $77,000 to Payne
in repayment of a loan for United's rent.[153]   Worldwide Strategic
Energy was reimbursed $14,567 for the travel and hotel expenses of

---

[147]   Doc. 93, Ex. B to Aff. of Michael Licker, Dep. of Saenz Dated Jan.
7, 2014 pp. 334-36.

[148]   Id.

[149]   Id. p. 3.

[150]   Id.

[151]   Doc. 92, Ex. J to Aff. of Michael Licker, Bank Records p. 1.
Westgate Tankships made a deposit in the amount of $1,812,423.   Id.

[152]   Id.

[153]   Doc. 93, Ex. B to Aff. of Michael Licker, Dep. of Saenz Dated Jan.
7, 2014 pp. 340-41.

Arrab and Linley Davidson related to a three-week stay.[154]
Worldwide Strategic Energy was reimbursed $11,203.80 for Payne's
overseas travel in August 2013.[155]  Overall, according to Saenz,
United paid Payne approximately $800,000.[156]  Part of that sum,
$100,000 to $150,000 was reimbursement for "commercial development
expenses," that is, according to Saenz, paying people in other
countries to "open doors."[157]

64.   Saenz testified that Arrab was paid approximately
$800,000 for his efforts on behalf of United.[158]  Enolia Marketing
was paid $400,000 to "open doors" with Samsung, Tokoyo Electric,
STX and Cogas in Korea.[159]

65.   Saenz stated that neither DCC Bulk, Ltd., nor Panther
Holding Group have signed limited partnership agreements with
United.[160]

66.   Saenz testified that he, Caudill, David Merkel, Brian
Ettinger, Emil Pena, Josh Grodin, Michael Spradley, Anthony Socci,
Brian Kerrigan, Daniel Schiller, the Vethan Law Firm, Sabra Punde,

---

[154]   Id. p. 342.   The deposition does not disclose the location of the travel.

[155]   Id. p. 344.

[156]   Id.

[157]   Id. pp. 348-50.

[158]   Id. pp. 354-63.   It is unclear if the $800,000 includes $460,149.81 that was paid to Arrabco, Arrab's company.   See id. pp.395-96.

[159]   Id. pp. 363-65.

[160]   Id. pp. 411-12.

Joe Reid, and United LNG Holdings have been allotted equity positions in United without capital contributions.[161]

67.   Saenz confirmed that the Panther Holding Group loaned United two million dollars and received a one-percent interest in United from Payne's shares.[162] He stated that DCC Bulk, Ltd., loaned United two million dollars on the same terms.[163]   Saenz confirmed that Westgate loaned two million dollars to United for the rights to own and operate six vessels serving the LNG project.[164]

68.   Saenz admitted that United has spent all the funds it has raised – $6.6 million dollars – and blamed this litigation for "a lot" of that sum.[165]

### III.   Proposed Conclusions of Law

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

In <u>Janvey v. Alguire</u>, 647 F.3d 585, 595 (5th Cir. 2011), the Fifth Circuit found that the district court had the power to grant injunctive relief before deciding whether to compel arbitration. In so finding, the court agreed with the plaintiff's position that a party could not "strip the trial court of its authority to enjoin

---

[161]   <u>Id.</u> pp. 413-15.

[162]   <u>Id.</u> p. 420.

[163]   <u>Id.</u> pp. 427-28.

[164]   <u>Id.</u> pp. 471-73.

[165]   <u>Id.</u> p. 416.

the party's conduct simply by filing a motion to compel arbitration." <u>Janvey</u>, 647 F.3d at 593.  The court in <u>Janvey</u> did not decide whether a district court may enjoin the parties to maintain the status quo if it later decides the case is arbitrable. <u>See</u> <u>Janvey</u>, 647 F.3d at 595.

In this action, Plaintiff's request for a preliminary injunction was filed at the inception of this suit.[166]  The court considers it before it considers Defendants' motion to compel arbitration.

In order to obtain a preliminary injunction, Plaintiff bears the burden of showing "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."  <u>Janvey</u>, 647 F.3d at 595.

## A.  <u>Likelihood of Success on the Merits</u>

For purposes of its request for preliminary injunctive relief, Marsoft relies only on its claims of breach of contract, tortious interference with a contract, tortious interference with a business relationship and business disparagement.  In order to meet its burden on the first element, Plaintiff must present a prima facie case of the claim that entitles it to the relief sought.  <u>Janvey</u>,

---

[166]     <u>See</u> Doc. 3, Pl.'s Mot. for Prelim. Inj.

647 F.3d at 596.

### 1.  **Breach of the LOA**

Here, in order to establish that United breached the LOA, Plaintiff must prove:  (1) the existence of a valid contract; (2) performance or tendered performance by Plaintiff; (3) breach of the contract by Defendant; and (4) damages sustained by Plaintiff as a result of the breach.  Roof Sys., Inc. v. Johns Manville Corp., 130 S.W.3d 430, 442 (Tex. App. - Houston [14th Dist.] 2004).

When interpreting a contract, a court must view the entire contract with an eye to harmonize and give effect to each and every provision of the contract so that none will be meaningless.  MCI Telecomms. Corp. v. Tex. Util. Elec. Co., 995 S.W.2d 647, 651 (Tex. 1999).  "[S]pecific and exact terms are given greater weight than general language."  Worldwide Asset Purchasing, L.L.C. v. Rent-A-Ctr. E., Inc., 290 S.W.3d 554, 560-61 (Tex. App. - Dallas 2009, no pet.).

Here, it is undisputed that the LOA is a valid contract.  The LOA provided that it was an evergreen contract and could be terminated only by a material breach.[167]  Plaintiff contends that it was performing under the LOA in a timely and satisfactory manner when the contract was terminated by United.  In support, Plaintiff cites the testimony of Eckbo, which established the efforts of Marsoft to comply with the "Key Deliverables" of the LOA.  As

---

[167]    See Pl.'s Ex. 3, LOA p. 5.

outlined above, the evidence supports a factual conclusion that Marsoft made significant efforts to deliver the contracted-for "Key Deliverables" outlined in the LOA and that United did not voice any dissatisfaction with Marsoft's performance until Marsoft refused to reduce its equity share in the project.

United's argument that Marsoft breached the LOA is based on its contention that Marsoft failed to secure investors for the project.  United has an affirmative burden to show that it was substantially justified in terminating the contract for nonperformance.  See Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 197 (Tex. 2004).  Whether the "Objective" section of the LOA contractually obligated Marsoft to secure investors and whether Marsoft's failure to secure investors was a material breach will be decided by the International Court of Commerce.  The court does not, then, issue any interpretation of that section in deciding whether Marsoft has shown a substantial likelihood of success on the merits.

After viewing the evidence as a whole, with the caveats that most of the evidence came from Marsoft and the evidence is offered in the early stages of litigation, the court concludes that Marsoft has met its burden of showing a substantial likelihood of success on the merits of its contract claim for payment for consulting services rendered under the LOA.  There is no evidence to the contrary.

32

Marsoft also alleges that United breached the LOA when it proposed to give Westgate the right to own or manage a certain number of ships in exchange for a high-interest loan. Marsoft complains that the LOA required that Marsoft and United share equity participation in "UL Marine," presently incorporated as UMHL, for the FLNG Project's marine activities and that, by directly transferring the rights to certain maritime activities to Westgate, United breached the LOA. In a related argument, Marsoft complains that the LOA granted Marsoft exclusive brokerage roles in tonnage acquisition and chartering of vessels and the Westgate agreement would deprive it of those fees.

The testimony concerning United's financial dealings with Westgate is certainly not transparent or complete. Saenz admitted that Westgate loaned two million dollars to United for the rights to own and operate six vessels that would serve the FLNG Project.[168] Unless it is determined that Marsoft breached the LOA prior to this transaction, this agreement would breach the terms of the LOA cited above because those were rights to be owned by Marsoft either directly, in the case of brokerage fees, or indirectly, through its equity participation in UL Marine/UMHL.

United's conduct in responding to discovery has been both delaying and evasive. It is not credible to the court that

---

[168]    Doc. 93, Ex. B to Aff. of Michael Licker, Dep. of Saenz Dated Jan. 7, 2014, pp. 471-73.

Westgate would loan two million dollars to United based on the non-binding terms of the February 5, 2013 proposal, and the court concludes that United has withheld critical documents from production. However, whether or not United has a binding agreement with Westgate granting Westgate a participation right in the maritime activities of the FLNG Project, it is clear from the evidence that United intends to sell rights that are covered by the LOA in order to obtain cash.[169] It is also clear from the evidence that United does not intend to transfer ten percent of its equity to UMHL and that this refusal is a breach of the LOA.

Marsoft has met its burden of showing a likelihood of success on the merits on its claim that United breached the LOA's provision that Marsoft have "an equity participation in all vessels and industry partnering groups" and that "UL Marine will receive an ownership of 10% in [United]."[170]

### 2.  Tortious interference with a contract

Marsoft alleges that United Holdings and Payne tortiously interfered with the LOA by causing United to: (1) refuse to pay Marsoft for services rendered; (2) offer third parties exclusive

---

[169]     Saenz admitted that Panther Holding Group and DCC Bulk, Ltd., also loaned United a total of four million dollars in exchange for a one-percent interest, each, in Payne's shares of United.  Such loans, if made in exchange for Payne's equity position in United, would not appear to directly violate the LOA because Payne is reducing his equity position, not Marsoft's participation in future maritime activities.  Since those agreements were not produced by United, the actual terms for the loans are unknown.

[170]     Pl.'s Ex. 3, LOA p. 5.

rights belonging to Marsoft under the LOA; and (3) wrongfully terminate the LOA.[171]

A claim for tortious interference with a contract may be established by proof that (1) a contract existed; (2) the defendant "willfully and intentionally interfered with that contract;" (3) the interference proximately caused damage; and (4) the plaintiff suffered actual damages.  Butnaru v. Ford Motor Co., 84 S.W.3d 198, 207 (Tex. 2002).  The plaintiff bears the burden of producing evidence that "the defendant knowingly induced one of the contracting parties to breach its contract obligations."  Rimkus Consulting Grp., Inc. v. Cammarata, 688 F. Supp.2d 598, 674-75 (S.D. Tex. 2010)(citing Texas cases).

However, a party to a contract cannot tortiously interfere with its own contract.  Hussong v. Schwan's Sales Enters., Inc., 896 S.W.2d 320, 326 (Tex. App. – Houston [1st Dist.] 1995).  An agent cannot be held liable for tortious interference with its principal's contracts.  John Masek Corp. v. Davis, 848 S.W.2d 170, 175 (Tex. App. – Houston [1st Dist.] 1992).   If Payne or United Holdings were acting on behalf of United when they refused to pay Marsoft, offered third parties rights belonging to Marsoft or terminated the LOA, they cannot be held liable for such actions.

Here, Marsoft has failed to show that United Holdings took any particular action that interfered with the LOA or rights granted

---

[171]    Doc. 1, Pl.'s Verified Compl. p. 11.

under the LOA.   With respect to Payne, there is substantial evidence that he attempted, for his own personal enrichment, to obtain a portion of Marsoft's equity interests in UMHL and, when Marsoft refused, Payne caused United to terminate the LOA.   The court finds that Marsoft has established a likelihood of success on the merits of this claim in that regard.   However, it is unclear from the evidence whether Payne's actions in offering third parties rights belonging to Marsoft and failing to pay Marsoft for consulting services rendered was a personal action or was on behalf of United.   Thus, the court cannot find a likelihood of success on the merits on those alalegations.

### 3. Tortious interference with a business relationship

Marsoft also complains that United, United Holdings and Payne tortiously interfered with a business relationship by failing to fund United's share of UMHL, refusing to have United perform its obligations under the LOA unless Marsoft agreed to change its ownership participation in the FLNG Project and making false statements to third parties that UMHL and Marsoft were no longer associated with the FLNG Project.[172]

In order to establish a cause of action for tortious interference with a prospective business relationship, Marsoft must show that: "(1) there was a reasonable probability that it would have entered into a contractual relationship with another; (2) the

---

[172]   Id. pp. 11-12.

36

defendant committed an independently tortious or unlawful act that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of [its] conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference."   Brown v. Swett & Crawford of Tex., Inc., 178 S.W.3d 373, 381-82 (Tex. App. – Houston [1st Dist.] 2005) (citing Baty v. ProTech Ins. Agency, 63 S.W.3d 841, 858 (Tex. App. – Houston [14th Dist.] 2001).

This claim appears to overlap with the preceding claim for tortious interference with a contract.  As Marsoft has failed to explain the prospective business relationship that it was prevented from entering into, the court finds that Marsoft has failed to meet its burden of showing a likelihood of success on the merits of this claim.

### 4.  Business disparagement

Marsoft alleges that United, United Holdings and Payne "published false and disparaging information" about Marsoft, to wit, that Marsoft caused a dispute with United, that United terminated Marsoft because of that dispute, and that Marsoft was no longer associated with the FLNG Project.[173]

In order to prevail on a business disparagement claim, Marsoft

---

[173]    Id. pp. 12-13.

37

must establish that (1) Defendants published false and disparaging information, (2) with malice, (3) without privilege, (4) that resulted in special damages. <u>Forbes Inc. v. Granada Biosciences, Inc.</u>, 124 S.W.3d 167, 170 (Tex. 2003); <u>Hurlbut v. Gulf Atl. Life Ins. Co.</u>, 749 S.W.2d 762, 766 (Tex. 1987).  A business disparagement claim is similar to a defamation action except that the interest protected in the case of business disparagement is economic interests, not reputation. <u>Forbes</u>, 124 S.W.3d at 170.

In <u>Forbes</u>, the Texas Supreme Court held that "[A] business disparagement defendant may be held liable only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." <u>Forbes</u>, 124 S.W.3d at 170 (internal quotations and citation omitted).

In the present case, Marsoft adduced evidence that United, through Saenz, Caudill or Payne, told Giekes that Marsoft had been terminated for its failure to produce "hard deliverables" under the LOA.[174]  However, Marsoft offered no evidence of what damages it incurred as a result of this alleged disparaging statement. Accordingly, the court finds that Marsoft has not shown a likelihood of success on the merits on this claim of business disparagement.

---

[174]    As stated above, the court has discounted the "rumor" evidence related by Bergh and Korsvold to Eckbo and will not consider it as a factual predicate for preliminary injunctive relief.  <u>See</u> Proposed Finding of Fact No. 43.

### 5. Summary

To conclude, the court finds that Marsoft has shown a substantial likelihood of success on its (1) contract claim for payment for consulting services rendered under the LOA, (2) contract claim related to United's alleged breach of the LOA's provisions that Marsoft have "an equity participation in all vessels and industry partnering groups" and that "UL Marine will receive an ownership of 10% in [United]," and (3) tortious interference with a contract claim against Payne for terminating the LOA after Marsoft refused to transfer a portion of its equity position in UMHL to him personally.

### B. Substantial Evidence of Irreparable Injury

An injury may be considered irreparable when the plaintiff cannot be compensated by damages or when damages cannot be measured by any certain pecuniary standard. Butnaru, 84 S.W.3d at 204.

Here, Marsoft's claim for payment for consulting services is compensable by contract damages and injunctive relief on that claim is not appropriate.

With respect to Marsoft's other contractual claim to participation rights in certain maritime activities, those damages may not be measured by any certain pecuniary standard. There is substantial evidence that, unless enjoined, United will continue to offer equity positions and participation rights already under contract to Marsoft in exchange for loans or other capital

39

contributions.  Once United contracts away those rights to third parties, Marsoft would have no ability to recoup the rights from the third parties even if it prevails in arbitration.  Similarly, if United sells, transfers or otherwise disposes of more than ninety percent of its equity ownership, it would not be able to transfer ten percent of United's stock to UMHL, as contemplated by the LOA, should Marsoft prevail in arbitration.

The court concludes that Marsoft has shown irreparable injury if United is not enjoined from offering third parties brokerage fees for tonnage acquisition and chartering contracts and a success fee if Marsoft obtains from an industry partner an up front exclusivity fee for United.  Marsoft has also shown an irreparable injury if United is able to sell, transfer or otherwise alienate in excess of ninety percent of its equity ownership while this case is pending before the International Court of Commerce.

The court does not find that Marsoft has shown irreparable injury arising out of its tortious interference with a contract claim against Payne, other than that discussed above in connection with its breach of contract claim because contract damages an compensate Marsoft if Payne is found liable.

**C.   Threatened Injury to Marsoft Outweighs the Injury to United**

United offered no evidence concerning the injury it would suffer if Marsoft's request for a preliminary injunction were to be granted.  The evidence adduced at the hearing demonstrated that

40

United has offered contractual rights, contemplated by the LOA to be owned by UL Marine/UMHL, to third parties in exchange for cash infusions that largely have been dispersed to its principals, personally.  If an injunction is issued, the harm flowing to United will be that it must preserve the status quo while the case is pending in arbitration.  This is not a significant injury. Accordingly, the court finds that the threatened injury to Marsoft outweighs any speculative injury to United.

**D.  Public Interest Will not be Disserved**

There is no evidence that the issuance of a preliminary injunction will disserve the public interest.

### IV.  Conclusion

It is **RECOMMENDED** that Plaintiff's Motion for Injunctive Relief be **GRANTED IN PART AND DENIED IN PART** for the reasons discussed above.  It is **RECOMMENDED** that the court issue a preliminary injunction enjoining United and Payne from:

a.  taking any action to diminish UL Marine/UMHL's equity stake in the maritime components of the FLNG Project, in particular, transferring maritime assets or rights to participate in maritime activities covered by the LOA to any other entity other than UMHL until the dispute between the parties is resolved in arbitration;

b.  reassigning or reselling Marsoft's exclusive brokerage roles under the LOA until the dispute between the parties is

41

resolved in arbitration.

The Clerk shall send copies of this Memorandum, Recommendation, and Order to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 3rd day of March, 2014.

Nancy K. Johnson
United States Magistrate Judge